UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOEL GARCIA-SALBALSA,<br><br>      Petitioner,<br><br>   v.<br><br>KIMBERLY A. SEIBEL, Warden,[1]<br><br>      Respondent. | Case No. 15-cv-01624-YGR (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY** |

Petitioner Noel Garcia-Salbalsa, a state prisoner currently incarcerated at Chuckawalla Valley State Prison, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2012 conviction and 2013 sentence rendered in the Sonoma County Superior Court. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the Petition for the reasons set forth below.

**I.     FACTUAL BACKGROUND**

The California Court of Appeal described the relevant facts as follows:

> On July 22, 2011, at approximately 1:30 p.m., Ramiro Chavez[FN 2], Conrrado Hernandez, and Jack Wilder were inside a residence on Park Tree Lane in Sonoma having lunch. Wilder had brought a large quantity of marijuana to the residence that day from Lake County. Suddenly, three or four Hispanic males stormed through the front door of the residence, each armed with a firearm. They demanded the three victims lie on the floor, and told them they would be shot and killed if they did not comply. While on the floor, the gunmen secured both Chavez and Hernandez by binding their wrists behind their back with zip ties. Wilder was bound with some type of leather or string. While the three victims were on the floor, the gunmen took items from the individual victims such as cash, keys, and a cell phone. They also took approximately 18 pounds of processed marijuana and $30,000 in cash from an unlocked safe in the residence.
>
> [FN 2: During these proceedings Ramiro Chavez was referred to as both Ramiro Chavez and Ramiro Ochoa. We will refer to him as Chavez because he testified that is the name he regularly uses.]
>
> After the gunmen left the residence, the victims were able to free

---

[1] Kimberly A. Seibel, the current warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

> themselves. They ran out of the residence and observed an orange Volkswagen (VW) Beetle fleeing the scene, traveling toward Santa Rosa. The victims called 911; and approximately one-half hour later, the orange VW Beetle with paper Arizona license plates was stopped in Santa Rosa. The vehicle had two occupants—appellant was in the front passenger seat and Richard Martin Marin-Casillas was in the driver's seat. Also located in the vehicle was approximately 18 pounds of processed marijuana that Wilder testified was taken in the robbery, three loaded firearms, and zip ties that matched the zip ties used at the crime scene. As of the time of trial, the $30,000 and the victims' personal property taken in the robbery had not been recovered.
>
> Shortly after the VW Beetle was stopped, the victims arrived together by private vehicle and an in-field identification was conducted. All three victims were able to identify appellant as being in the residence and participating in the robbery. Hernandez realized he had previously seen the driver of the VW Beetle. The man had been with Hernandez's cousin and had inquired about marijuana and marijuana sales. A piece of paper was found inside the VW Beetle that had Hernandez's name and telephone number on it.
>
> At trial, appellant's defense was that the victims' testimony was not credible. Instead of being a theft, all of the men were involved in a marijuana sale that went awry. In rebuttal, the prosecutor argued, "Could it have been a drug deal gone bad? There's not really any evidence, but . . . even if this is a drug deal gone bad, we still have a robbery."

*People v. Garcia-Salbalsa*, No. A137704, 2014 WL 5882534, *1-2 (Cal. Ct. App. Nov. 13, 2014) (footnote in original).

## II.  PROCEDURAL BACKGROUND

On October 10, 2012, a Sonoma County jury found Petitioner guilty of robbery, false imprisonment, and grand theft, and also found that he was armed with and used a firearm during the commission of those offenses. CT 142-147; 2CT 305-308.

On January 18, 2013, Petitioner was sentenced to serve sixteen years in state prison. 2CT 411-412.

On January 24, 2013, Petitioner appealed the judgment to the California Court of Appeal. 2CT 413. On November 13, 2014, the state appellate court affirmed the judgment. *Garcia-Salbalsa*, 2014 WL 5882534, *6; Resp't Ex. 4.

Thereafter, Petitioner filed a petition for review in the California Supreme Court, and review was denied on January 28, 2015. Resp't Ex. 5.

2

1  On April 8, 2015, Petitioner filed the instant petition. Dkt. 1.

2  On May 29, 2015, this Court issued an Order to Show Cause. Dkt. 5. Respondent filed an Answer. Dkt. 6. Although given the opportunity to do so, Petitioner did not file a Traverse. The matter is fully briefed and ripe for adjudication.

### III. LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ.

3

1   *Id.* at 409.

2   Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). The last reasoned decision in this case is the California Court of Appeal's unpublished disposition issued on November 13, 2014.

**IV.   DISCUSSION**

Petitioner asserts the following two claims: (1) the trial court committed prejudicial error and violated his due process rights when it admitted evidence of unduly suggestive and unreliable in-field identifications; and (2) the trial court abused its discretion by denying his motion to disclose juror identifying information to enable the defense to investigate whether it had a viable

basis for a new trial motion based on jury misconduct. Dkt. 1 at 12-30.[2]

### A.     In-Field Identifications

Petitioner contends that the trial court erred by denying his motion to suppress the evidence of the victims' in-field identifications made shortly after the robbery. *Id.* at 12. He argues that the trial court violated his due process rights to a fair trial when it erroneously admitted the unduly suggestive and unreliable in-field identifications and, therefore, his conviction must be reversed. *Id.* at 12-24.

#### 1.     Background

The state appellate court gave the following background relating to this claim:

> The jury heard evidence that all three robbery victims identified appellant as one of the men who committed the robbery during an in-field show up which took place approximately an hour and a half after the robbery at the scene of the vehicle stop. Chavez testified that during the robbery, he saw the robbers' faces "for a little bit." The men did not wear masks. Two of the robbers were short, approximately five feet six inches tall, and stocky. The third man was approximately five feet nine inches tall. The robbers were all Latino, and they spoke in Spanish. The field show-up was performed when the faces of the gunmen were "pretty fresh" in Chavez's mind. Chavez identified appellant as one of the robbers.
>
> Before the field show up, Hernandez described three individuals by race, approximate height and weight, vehicle, and clothing. Hernandez described one of the robbers as a Latino male wearing a red and white striped shirt. At the field show up, Hernandez immediately recognized the man in the red and white striped shirt, who was later identified as appellant.
>
> Wilder testified that the robbers were all Mexican. They spoke in English and in Spanish. Wilder also recalled the stripes on the robbers' shirts. At the field show-up the events were still "very fresh" in Wilder's mind—only 45 minutes to an hour had passed since the robbery. Wilder identified appellant as one of the robbers.

*Garcia-Salbalsa*, 2014 WL 5882534, *2.

In rejecting this claim, the state appellate court found that the victims' in-field identifications were not impermissibly suggestive and stated as follows:

> In deciding whether appellant was subjected to an impermissibly suggestive and unreliable identification procedure, appellant bears

---

[2] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by Petitioner.

the burden of establishing (1) that the procedure used was unduly suggestive and unnecessary, and (2) if so, that the identification by the witness was unreliable under the totality of the circumstances, taking into account such factors as the witness's opportunity to view the perpetrator at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspects, the level of certainty the witness demonstrated at the show-up, and the time between the crime and the show-up. (*People v. Ochoa* (1998) 19 Cal. 4th 353, 412 (*Ochoa*).) The defendant must establish "unfairness as a demonstrable reality, not just speculation. [Citation.]" (*People v. DeSantis* (1992) 2 Cal. 4th 1198, 1222.) "Where the defendant claims the pretrial identification was unnecessarily suggestive, he must show it gave rise to a very substantial likelihood of irreparable misidentification. [Citations.]" (*People v. Craig* (1978) 86 Cal. App. 3d 905, 913 (*Craig*).)

While acknowledging that California courts have not found individual show-ups inherently unfair, appellant urges this court to join a number of out-of-state jurisdictions choosing to abolish in-field show-ups in light of psychological studies which conclude they are unduly suggestive and inherently unreliable. Despite these cases from other jurisdictions, our Supreme Court has consistently held a single person show up "'is not inherently unfair,'" and consequently need not, absent unusual circumstances, be excluded from the presentation of evidence on due process grounds. (*Ochoa, supra*, 19 Cal. 4th at p. 413, quoting *People v. Floyd* (1970) 1 Cal. 3d 694, 714, overruled on another point in *People v. Wheeler* (1978) 22 Cal. 3d 258, 287, fn. 36; *People v. Bauer* (1969) 1 Cal. 3d 368, 374.) We are bound by the decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal. 2d 450, 455.)

Appellant also argues the show-up here was totally unnecessary because there was no compelling reason to conduct a show up as opposed to waiting until a time when a lineup could be arranged. However, prompt identification of a suspect close to the time and place of the offense serves the legitimate purpose of quickly ruling out innocent suspects while the events are fresh in the witness's mind. (*People v. Nguyen* (1994) 23 Cal. App. 4th 32, 38-39; *In re Carlos M.* (1990) 220 Cal. App. 3d 372, 387.) Also, such identifications are likely to be more accurate than a belated formal identification procedure. (*People v. Martinez* (1989) 207 Cal. App. 3d 1204, 1219; *People v. Anthony* (1970) 7 Cal. App. 3d 751, 764-765 (*Anthony*).) Therefore, courts have consistently found the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended. (*Anthony*, at p. 765.)

Appellant also asserts that the manner in which the show-up was conducted in this case was unduly suggestive. He complains that multiple police officers and patrol cars were present during the show-up; one of those patrol cars was parked directly behind the orange VW Beetle, which was the same make, model and color described by the victims as the getaway car. Appellant and his companion were the sole Latino males in the vicinity. Additionally, before appellant was identified, he was taken out of the patrol car in handcuffs.

But the factors highlighted by appellant, while they may be suggestive, have not been found by the courts to require suppression of identification testimony. (*See In re Richard W.* (1979) 91 Cal. App. 3d 960, 969-970 [no due process violation when witness identified suspect shortly after burglary while suspect was handcuffed and seated in the back of a patrol car]; *People v. Savala* (1981) 116 Cal. App. 3d 41, 49 [no due process violation where showup procedures were "factually similar" to those in *In re Richard W.*]; *Craig, supra*, 86 Cal. App. 3d at p. 914 [defendants were inside a police car and officers stood around the car]; *Anthony, supra*, 7 Cal. App. 3d at p. 764 [officers drove defendant and his companion to the scene of the robbery in a marked police vehicle, handcuffed, and asked the witness "'which was the one that came in'" and committed the robbery]; *People v. Gomez* (1976) 63 Cal. App. 3d 328, 335 [defendant stood outside a patrol car, was handcuffed and accompanied by two officers].

In the present case, appellant has pointed to only one factor which could possibly make the in-field identification procedure unnecessarily suggestive. During the hearing on the suppression motion, Hernandez testified the police told him before the in-field show-up that they planned on arresting the suspects because "they found pistols and a large amount of marijuana in the car . . . ." It undoubtedly would have been preferable if the police had not discussed this incriminating evidence with Hernandez. However, this did not make Hernandez's subsequent identification of appellant constitutionally infirm. Hernandez immediately recognized appellant as one of the robbers, not based upon anything the police told him, but based upon the distinctive red and white striped shirt he was wearing, which Hernandez had described to the police before he identified appellant at the in-field show-up. Even "[w]hen an eyewitness has been subjected to undue suggestion, the factfinder must nonetheless be allowed to hear and evaluate his identification testimony unless the "'totality of the circumstances'" suggests '"a very substantial likelihood of irreparable misidentification."' [Citations.]' No such likelihood appears here." (*People v. Arias* (1996) 13 Cal. 4th 92, 168.)

Additionally, appellant argues the identifications were unreliable because at different points in these proceedings the victims misidentified or failed to recognize appellant. However these matters go to the weight not the admissibility of this evidence. During closing argument, appellant's trial counsel discussed the eyewitness identifications and pointed out inconsistencies and circumstances suggesting they were unreliable. Due process is not violated merely because identification evidence is not "the most reliable" because "'"[c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to . . . any suggestibility in the identification procedure . . . ." [Citation.]" (*People v. Gordon* (1990) 50 Cal. 3d 1223, 1243, overruled on another point in *People v. Edwards* (1991) 54 Cal. 3d 787, 835.) Short of a "'substantial likelihood of irreparable misidentification' . . . [identification] evidence is for the jury to weigh . . . . Juries are not so susceptible that they cannot

7

> measure intelligently the weight of identification testimony that has some questionable feature." (*Manson v. Brathwaite* (1977) 432 U.S. 98, 116.)
>
> In conclusion, on this record, appellant did not meet his burden of demonstrating the show-up procedure was unduly suggestive and unnecessary or that it gave rise to a "very substantial likelihood of irreparable misidentification. [Citation.]" (*Craig, supra*, 86 Cal. App. 3d at p. 913.)  There was strong evidence corroborating the victims' identifications which linked appellant to the crime committed on July 22, 2011.  This evidence included appellant's presence a short time after the crime in the orange VW Beetle that was described by the victims as the getaway car.  Furthermore, the officers found indicia of the robbery in the VW Beetle when appellant was apprehended, including approximately 18 pounds of marijuana, several loaded firearms, and zip ties that were identical to those used to bind the victims.  Appellant was also wearing the red and white striped shirt Hernandez had previously described to the police as being worn by one of the gunmen.  This corroborating evidence gives independent reliability to the victims' identifications. (*See Anthony, supra*, 7 Cal. App. 3d at p. 765 [circumstantial evidence defendant was robber was "overwhelming"].)  As in *People v. Sanders* (1990) 51 Cal. 3d 471, "[a]lthough none of these items points unerringly towards defendant's guilt, they constitute links in the chain of evidence against him and thus provide some corroboration of [the witness's] identification of defendant as the guilty party." (*Id*. at p. 506.)

*Id.* at *3-4.

### 2. Applicable Law

The United States Supreme Court has clearly established that an identification procedure may be so prejudicial as to amount to a denial of due process. *See Simmons v. United States*, 390 U.S. 377, 383 (1968).  A challenge to an identification procedure is reviewed under the totality of the circumstances. *Id.*

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." *Stovall v. Denno*, 388 U.S. 293, 297 (1967) *overruled on other grounds*, *Griffith v. Kentucky*, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules propounded by Supreme Court). Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive.  "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972).  Due process protects against the admission of evidence derived from certain suggestive identification procedures.  *See id.* at 196; *cf. Manson v. Brathwaite*, 432 U.S. 98, 106 n.9 (1977) (standards are

not different for pretrial and in-trial identifications). Unnecessarily suggestive identification procedures alone do not require exclusion of in-court identification testimony, however; "reliability is the linchpin in determining the admissibility of identification testimony." *See id.* at 114. The factors to consider with regard to an alleged misidentification include: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. *See id.* at 114. In weighing these factors, the court's ultimate goal is to determine whether, under all the circumstances, there is a very substantial likelihood of irreparable misidentification. *Id.* at 116. Short of that, the identification testimony is properly received and any flaws in the procedures used are for the jury to weigh. *Id.*

To prevail on a habeas claim, the petitioner must show that the identification procedures used in the case were "'so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.), *cert. denied*, 516 U.S. 1017 (1995) (quoting *Stovall*, 388 U.S. at 301-02).

### 3. Analysis

As explained above, the state appellate court found that the in-field identifications by Chavez, Hernandez and Wilder were not impermissibly suggestive. *Garcia-Salbalsa*, 2014 WL 5882534, *3-4. The court acknowledged that Petitioner had pointed to only one factor which could possibly make the in-field identification unduly suggestive—police had discussed incriminating evidence with Hernandez before the in-field show-up. However, as indicated above, the state appellate court concluded that even if the in-field identifications were unduly suggestive, they were reliable under the totality of the circumstances.

The record shows that prior to the in-field show-up, police had the two suspects in handcuffs in the back of separate patrol cars. 2CT 215-216; 12RT 1598. One of the patrol cars was parked directly behind an orange VW Beetle. 2CT 216. An officer pulled one man out of the back of one patrol car and turned him around to show his face to the three victims, who were together in one car. 12RT 1598. Then another officer took the second man out of the back of the

other patrol car, and turned him around to show his face to the victims. 12RT 1598.

Chavez claims that during the robbery he saw the male robbers' faces "for a little bit"; they did not wear masks. 12RT 1532-1533, 1536. Chavez testified that "two to five minutes" elapsed from the time the robbers first came in to the time they all left. 1CT 34. Two of the robbers were short and stocky, and the third man was approximately five feet nine inches tall. 12RT 1533. Chavez claims that a fourth robber came in after he was on the ground. 12RT 1533. The robbers were all Mexican or Hispanic, and they spoke in Spanish. 12RT 1533-1534. The in-field show-up was performed an hour to an hour and a half after the robbery, when the faces of the gunmen were "pretty fresh" in Chavez's mind. 12RT 1544-1546. At the in-field show-up, Chavez identified Petitioner as one of the robbers, but he was not able to identify Marin-Casillas. 12RT 1545; 2CT 220-221.

Hernandez was able to observe three male unmasked robbers for "five seconds." 12RT 1587-1588. They wore striped polo shirts. 12RT 1588. Two robbers' polo shirts were either grey, black or blue with white stripes, and the third wore "a red and white shirt with white stripes." 12RT 1588. The men spoke in English and Spanish. 12RT 1588. Although all were Hispanic, they had different complexions—one man was very dark while the other two were light skinned. 12RT 1588-1589. When Hernandez described the men for the police, he also provided their builds and their approximate heights and weights. 12RT 1597-1598. At the preliminary hearing, Hernandez testified that when he arrived at the location for the in-field show-up, officers told him that they were going to arrest the suspects because "they found pistols and a large amount of marijuana in the car . . . ." 1CT 86. At the in-field show-up, Hernandez was able to identify one of the suspects as one of the robbers—the man in the red and white striped polo shirt, who was later identified as Petitioner. 12RT 1598, 1600-1601, 1609. Hernandez said he was one hundred percent sure of his identification. 12RT 1600. However, Hernandez was not as confident of his identification of the second man. 12RT 1600. Hernandez thought the second suspect "could have been the gentleman that put the gun in [his] face" during the robbery, but he was not one hundred percent sure. 12RT 1600. Hernandez also recognized and identified Petitioner at the trial. 12RT 1600-1601.

Wilder testified that the robbery was still "very fresh" in his mind during the in-field show-up because only forty-five minutes to an hour had passed. 12RT 1665. Wilder identified both Petitioner and Marin-Casillas as two of the robbers. 12RT 1667. Wilder also recognized and identified Petitioner at the trial. 12RT 1667.

Here, Petitioner has met his burden to show that the challenged procedure was impermissibly suggestive upon examining the totality of the circumstances and taking the following factors into consideration: (1) Petitioner and Marin-Casillas were seated in patrol cars when the victims arrived prior to the in-field show-up; (2) they were displayed to the victims near five patrol cars, one of which was parked directly behind the orange VW Beetle; (3) they were the only Mexican men in the parking lot; and (4) Hernandez was told Petitioner was going to be arrested because there were guns and marijuana in the orange VW Beetle. *See* Dkt. 1 at 18. Those circumstances were suggestive—suggesting that Petitioner and Marin-Casillas were the ones police thought worth arresting and, in turn, suggesting they were ones whom police thought to be the perpetrators. Thus, this Court disagrees with the state appellate court's finding that the in-field show-up procedure was not suggestive.

However, the suggestiveness of the show-ups does not necessarily make them unreliable because the Supreme Court has not made reliability and suggestiveness synonymous and requires that they be viewed separately. *See generally Neil*, 409 U.S. at 198-99.

Petitioner further argues that the victims' identifications were unreliable. Dkt. 1 at 19. Specifically, Petitioner argues the victims' ability and opportunity to observe the robbers were "minimal" because the "robbery took all of five minutes." *Id.* Petitioner adds that the victims were immediately ordered to get down on the ground "within second[s] of the men entering the house" and each of them complied. *Id.* at 19-20. Petitioner claims the victims' "degree of concentration or attention was questionable" because "they feared for their lives and their observation of the perpetrators occurred during a stressful situation. *Id.* at 20. Finally, although Petitioner acknowledges the short time between the robbery and the in-field identifications, he argues that factor "pales in significance to the combined weight of the other factors, all of which militate against a finding the witnesses' identification had a sufficient indicia of reliability." *Id.* at

11

22. This Court disagrees with Petitioner and finds that the state appellate court was reasonable in finding that the reliability of the victims' identification was strong. As the state appellate court explained, all three victims had ample opportunity to view the robbers during daylight confrontations where the robbers did not wear masks. The victims were attentive and able to provide a description of each of the robbers' clothes and physique (including their language and race), and their descriptions of one of the robbers accurately matched Petitioner. All three victims made their identifications within forty-five minutes to an hour after the robbery, and two testified that the faces of the robbers were fresh in their minds. During the in-field show-up, all three victims identified Petitioner as one of the robbers, but two of them were unable to identify Marin-Casillas, which indicates their identifications were not automatic. Therefore, the state appellate court was reasonable in finding that the victims' identification of Petitioner was reliable under the totality of the circumstances. *See Garcia-Salbalsa*, 2014 WL 5882534, \*4.

Finally, the state appellate court reasonably found that there was "strong evidence corroborating the victims' identifications which linked [Petitioner] to the crime committed on July 22, 2011," including: (1) Petitioner's presence in an orange VW Beetle matching the getaway car right after the robbery; (2) incriminating evidence was found in that VW Beetle such as marijuana, several loaded firearms, and zip ties identical to those used to bind the victims; and (3) Petitioner was wearing a red and white striped shirt that matched the victim's description of one of the robbers. *Id.* The state appellate court thus reasonably concluded that the aforementioned corroborating evidence "gives independent reliability to the victims' identifications." *Id.*

Accordingly, the state appellate court's finding—that the admission of evidence that the three victims identified Petitioner in an in-field show-up did not result in a due process violation—was not contrary to or an unreasonable application of clearly established federal law. Therefore, this claim is DENIED.

**B.     Access to Juror Identification Information**

Petitioner contends that the trial court violated his rights to a fair trial and an impartial jury when it denied his motion for access to personal juror identifying information, which he sought in order to investigate potential juror misconduct. Dkt. 1 at 24-25.

12

The state appellate court rejected Petitioner's claim as follows:

> After the jury returned its verdict, appellant filed a petition requesting the release of juror information. A supporting declaration was submitted from appellant's trial counsel indicating that after the verdict had been rendered, the jury foreman told counsel that he experimented with the zip ties provided to the jury as exhibits to see how easily they could be removed. Counsel indicated that further inquiry into possible juror misconduct was needed to support a motion for a new trial. This request was opposed by the prosecution, arguing "the juror conduct described in counsel's declaration is clearly within the scope of permissible jury examination of the evidence and thereby the defense fails to establish a prima facie showing of good cause." The trial court denied the motion because the defense failed to make a prima facie showing of good cause. The court found it was "merely supposition at this point."
>
> Code of Civil Procedure section 206, subdivision (g), provides that after the jury in a criminal case is discharged, a defendant may petition the court for an order releasing information concerning the jurors' names, addresses, and telephone numbers for the purpose of preparing a motion for new trial. That statute references Code of Civil Procedure section 237, which provides, in part, that after records containing criminal jurors' personal identification information are ordered sealed at the conclusion of trial, any person may make a motion to obtain access to the sealed records, accompanied by a showing of good cause. (Code Civ. Proc., § 237, subd. (b); see *People v. Wilson* (1996) 43 Cal. App. 4th 839, 852 (*Wilson*).)
>
> To demonstrate good cause, a defendant must make a sufficient showing "'to support a reasonable belief that jury misconduct occurred . . . .'" (*People v. Jones* (1998) 17 Cal. 4th 279, 317 (*Jones*).) The alleged misconduct must be "'of such a character as is likely to have influenced the verdict improperly' [citation]." (*People v. Jefflo* (1998) 63 Cal. App. 4th 1314, 1322.) Good cause does not exist where the allegations of jury misconduct are speculative (*Wilson, supra,* 43 Cal. App. 4th at p. 852), and speculative allegations may not be used as grounds to initiate an unwarranted fishing expedition by parties hoping to uncover information to invalidate the jury's verdict. (*People v. Rhodes* (1989) 212 Cal. App. 3d 541, 552.) A trial court's order denying a request for personal juror identifying information is reviewed for abuse of discretion. (*Jones, supra*, 17 Cal. 4th at p. 317.)
>
> Indisputably, it is misconduct for the jury to conduct its own investigation outside the courtroom, including experiments which could be treated as evidence not presented at trial. (*People v. Vigil* (2011) 191 Cal. App. 4th 1474, 1483 (*Vigil*); *People v. Castro* (1986) 184 Cal. App. 3d 849, 852-854 (*Castro*).) But, not every jury experiment constitutes misconduct. "Improper experiments are those that allow the jury to discover new evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh

13

and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the '"scope and purview of the evidence."' [Citation.] What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*People v. Collins* (2010) 49 Cal. 4th 175, 249.)

Accordingly, a jury has the right to examine and test the evidence presented at trial in a form which might be construed as an "experiment" but which does not go beyond the scope of the evidence. (*See Castro, supra*, 184 Cal .App. 3d at pp. 855.) The distinction between proper and improper experimentation by the jury "usually turns on whether the juror's investigation stayed within the parameters of admitted evidence or created new evidence, which the injured party had no opportunity to rebut or question." (*Vigil, supra*, 191 Cal. App. 4th at p. 1484.)

Here, the record contains no indication that the juror's experiment with the zip ties interjected any information outside the record which would expand upon the evidence presented at trial. After all, courts have repeatedly held that a litigant is not deprived of a fair trial where a jury conducts an experiment with trial exhibits which merely tests the credibility of in-court testimony. For example, in *People v. Bogle* (1995) 41 Cal. App. 4th 770, the defendant identified the lock each of his keys would open, but there was no evidence any of the keys could open a safe that was at issue. (*Id*. at p. 777.) During their deliberations, the jurors found that one of the keys opened the safe. (*Ibid*.) The Court of Appeal held this was not an improper experiment because it fell within an "area of inquiry" discussed at trial, namely, "the extent of the defendant's access to the contents of the safe or whether the defendant was a credible witness." (*Id*. at p. 779; see also *People v. Baldine* (2001) 94 Cal. App. 4th 773, 778-780 [jury did not invade any new field by turning on a scanner to test the credibility of the defendant's assertion that it did not work, even though the scanner was not tested during trial]; *People v. Cooper* (1979) 95 Cal. App. 3d 844, 852, 854 [jury did not generate new evidence by reenacting the defendant's throwing of a plastic bag to evaluate the credibility of a police officer's testimony because it was a reenactment of a demonstration performed during trial].)

Consequently, the record supports the trial court's conclusion that the juror misconduct claimed by appellant was founded on speculation and surmise, which are inadequate grounds for releasing confidential juror information. (*Wilson, supra*, 43 Cal. App. 4th at p. 852.) Under these circumstances, the trial court did not abuse its discretion when it found an absence of good cause, and denied appellant's motion for disclosure of the jurors' personal identifying information.

*Garcia-Salbalsa*, 2014 WL 5882534, *4-6.

Petitioner cites no United States Supreme Court authority recognizing a constitutional right to have jury information unsealed, and this Court has found none. *See e.g., Pablo v. Bitter*, 2014

14

WL 1900627, *10 (N.D. Cal. 2014) *affirmed by* 608 Fed. Appx. 523 (9th Cir. 2015); *Burpee v. Hedgpeth*, 2013 WL 6731042, *9 (N.D. Cal. 2013); *White v. Knowles*, 2011 WL 1196053, *5 (N.D. Cal. 2011). Further, no federal law, clearly established by the Supreme Court or otherwise, requires a state court to permit post-trial access to jurors in a fishing expedition for misconduct. *See Grotemeyer v. Hickman*, 393 F.3d 871, 881 (9th Cir. 2004), *cert. denied*, 546 U.S. 880 (2005) (no constitutional violation in state court's denial of further factual development regarding jury misconduct allegations). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citations omitted). Therefore, the trial court's allegedly improper denial of Petitioner's motion for access to personal identifying information pursuant to California Code of Civil Procedure § 237 is not a basis for federal habeas relief. *See id.*; *see also Yang v. McDonald*, 2012 WL 6738311, *18 (E.D. Cal. 2012) (finding state courts' allegedly improper application of Cal. Code Civ. P. § 237 is not basis for federal habeas relief). Nor can Petitioner transform a state law issue into a federal one merely by asserting a violation of due process. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). Regardless, because Petitioner's showing on the new trial motion did not establish a prima facie case of misconduct, the foreclosure of further investigation cannot support habeas relief. Petitioner's claim of jury misconduct was wholly speculative at best. Defense counsel informed the court that he was "not arguing whether actual misconduct occurred or not" during jury deliberations, because he "[did]n't know just yet what actually occurred in deliberations." 17RT 2403-2404. The state appellate court reasonably found that the trial court's conclusion that speculation and surmise are inadequate grounds for releasing confidential juror information. *Garcia-Salbalsa*, 2014 WL 5882534, *6 (citing *Wilson*, 43 Cal. App. 4th at 852).

Nor was Petitioner denied his right to ineffective assistance of counsel, to present a motion for new trial, to research the issue of juror misconduct, to investigate his case, or to present a defense. *See* Dkt. 1 at 29-30. None of these aforementioned actions could or would have changed permissible juror conduct into improper juror misconduct.

Because California Code of Civil Procedure § 237 did not infringe on Petitioner's fundamental liberty interest in the right to an impartial jury, the state appellate court's rejection of this claim was neither contrary to, nor an unreasonable application of established Supreme Court precedent. Accordingly, this claim is DENIED.

## V. CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## VI. CONCLUSION

For the reasons outlined above, the Court orders as follows:

1. All claims from the petition are DENIED, and a certificate of appealability will not issue. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2. The Clerk of the Court shall enter judgment, terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: June 3, 2016

YVONNE GONZALEZ ROGERS
United States District Judge